

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **DARRYLE D. BOHANNA, JR.** | § | Case No. 18-40847 |
| xxx-xx-8665 | § | |
| | § | |
| Debtor | § | Chapter 7 |

| | | |
|---|---|---|
| ALYSON SIMMONS | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Adversary No. 18-4065 |
| | § | |
| DARRYLE D. BOHANNA, JR. | § | |
| | § | |
| Defendant | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

Upon trial of the amended complaint filed by the Plaintiff, Alyson Simmons

("Plaintiff"), seeking to deny the entry of a Chapter 7 discharge in favor of the Debtor-

Defendant, Darryle D. Bohanna, Jr. ("Defendant" or "Debtor"), pursuant to 11 U.S.C §

727(a)(4)(A) or, alternatively, seeking a determination of whether an alleged debt owed to

her by the Debtor-Defendant should be excepted from discharge pursuant to 11 U.S.C.

§ 523(a)(2)(A), the Court issues the following findings of fact and conclusions of law.

This memorandum disposes of all issues pending before the Court.

---

[1] These findings of fact and conclusions of law are not designated for publication and shall not
be considered as precedent, except under the respective doctrines of claim preclusion, issue preclusion,
the law of the case or as to other applicable evidentiary doctrines.

# FINDINGS OF FACT

1.      The Plaintiff, Alyson Simmons, first became acquainted with the Debtor-Defendant, Darryle Bohanna, Jr., and his spouse in 2006 through their church affiliation.

2.      Through their church connections, the Plaintiff developed close personal ties with the Defendant, his wife, and his children over the next eight years.

3.      The Plaintiff served as godmother to the Defendant's children, presented gifts to the children on special occasions, and periodically would provide other types of financial assistance to the household.

4.      The Plaintiff considered the Defendant to be a close confidant and they enjoyed a social, business, and personal relationship for several years.

5.      The close contact ceased at some point in time in 2014.

6.      In December 2014, after a few months' absence, the Defendant contacted the Plaintiff regarding his need for financial assistance.

7.      His financial assistance request was driven by his decision to separate from his wife[2] and was exacerbated by a loss of employment income.

8.      The Defendant expressed his concern to the Plaintiff regarding his inability to provide financially for the needs of his children, and his estranged spouse with whom the children were still living, as the divorce process unfolded.

9.      The Defendant promised to repay the Plaintiff for all sums advanced once the financial uncertainties caused by the divorce and job losses were resolved.

10.     The Plaintiff was likely influenced by the fact that she had advanced moneys in the past to the Defendant and his wife in excess of $3,000.00 and all of those borrowed funds had been timely repaid.

11.     Because of her close relationship to the Defendant's family and arising from a concern for their welfare, the Plaintiff agreed in December 2014 to authorize the Defendant to use certain of her personal credit cards to guarantee that he would

---

[2]  The Defendant eventually filed for divorce in November 2015 and the divorce was finalized in September 2016.

have access to needed financial resources as needs might arise during the divorce proceedings.

12. Thus, as subsequently determined in litigation, the series of credit advances were procured by the Defendant and authorized by the Plaintiff for the express and specific purpose of supporting Defendant and Defendant's wife and children during their divorce proceedings.

13. The Plaintiff did not require the execution of a written promissory note or any other document by the Defendant which would memorialize and govern the lending transaction.

14. The Defendant was given unfettered access to the selected credit accounts of the Plaintiff.

15. However, other than the general purpose of the transaction, there was no protocol nor any specific guidelines established by the Plaintiff to govern the amount or purpose of any charge by the Defendant, nor was any aggregate limit placed upon the amounts which the Defendant could access.

16. Though the Plaintiff received monthly statements on these credit accounts and though she may have possessed expectations as to the nature of the anticipated charges, such as for mortgage payments on the Defendant's family home, the evidence fails to suggest that the Plaintiff made any effort to keep apprised of the nature or amounts of the Defendant's charges on a monthly basis as they accrued.

17. Thus, the lone caveat to the Debtor's use and access of the Plaintiff's credit accounts was the requirement that such expenditures fall within the scope of the parties' verbal agreement.

18. For a period of fourteen months, from December 2014 to February 2016 (the "Lending Period"), the Defendant borrowed funds from the credit accounts of the Plaintiff for various expenditures.

19. The monthly expenditures often included gasoline, fast food, wireless phone bills, auto parts, insurance payments for unspecified assets, and undesignated cash advances.

20. There were no mortgage obligations directly charged to the accounts during the Lending Period.

21.   There were no charges incurred against the accounts during the Lending Period that clearly promoted the children's general welfare.

22.   In February 2016, the Plaintiff terminated the lending relationship, claiming that the Defendant had violated the terms of the oral agreement.

23.   It is difficult under the evidence presented to corroborate the actual precipitating cause of the termination of the lending relationship, although the Plaintiff apparently first learned in this time period that the Defendant had been involved in a romantic relationship with another person since 2013.

24.   The Plaintiff further claims to have first learned in early 2016 that the Defendant had failed within the Lending Period to fulfill the contractual obligations regarding his family's home and that the property was in foreclosure proceedings.

25.   The Plaintiff contends that she became suspicious about the Defendant's actions (or inactions) only at the conclusion of the Lending Period, even though the Plaintiff had possessed continuous access to the monthly statements and any examination of them at any point within the Lending Period would have revealed the nature of all of the Defendant's charges, including the fact that the credit accounts were not being utilized to make mortgage payments or other obligations directly tied to the children's welfare.

26.   On or about March 2016, Plaintiff demanded complete and immediate repayment of the loans from the Defendant.

27.   Despite the Defendant's repeated assurances that he would repay the borrowed amounts once his financial situation had stabilized and even after the Plaintiff forwarded a formal Demand for Payment Notice to him in July 2016, the Defendant failed to repay the debt in whole or in part.

*The Iowa Litigation*

28.   On or about June 26, 2017, the Plaintiff filed a petition in Iowa state district court against the Defendant to collect the indebtedness (the "Iowa Litigation").[3]

29.   The petition in the Iowa Litigation sought a judgment against the Defendant,

---

[3]  Plaintiff's Ex. 2.  This state court petition was filed before the District Court for Polk County, Iowa under Cause No. LACL 138269 and was styled *Alyson Simmons v. Darryle D. Bohanna.*

treating each monetary advance as a separate loan, under the asserted theories of breach of oral contract, detrimental reliance, fraudulent misrepresentation, and unjust enrichment.

30. The Defendant subsequently filed a general denial to the petition.[4]

31. On or about this same time period, the Defendant relocated from Iowa to Texas.

32. Pending a trial in the Iowa Litigation, Plaintiff subsequently filed a motion for partial summary judgment based solely upon breach of the asserted oral contracts, detrimental reliance, and unjust enrichment.[5]

33. The Defendant appeared by telephonic means at the summary judgment hearing conducted on January 4, 2018 in the Iowa Litigation, but filed no "resistance" to the summary judgment motion, no statement of disputed facts, no affidavit, nor any other written response.[6]

34. In its consideration of the motion for partial summary judgment and the summary judgment record established thereby, the Iowa District Court declared that the following facts were established as undisputed:[7]

    (a)    Over the course of 2014, 2015 and early 2016, Defendant made numerous, frequent and persistent complaints to Plaintiff about Defendant's dire financial condition.

    (b)    Defendant made numerous, frequent and persistent entreaties for money to Plaintiff during same period of time.

    (c)    Defendant's entreaties requested a series of loans from Plaintiff for the express and specific purpose of supporting Defendant and Defendant's wife and children during their divorce proceedings.

    (d)    As a result of said entreaties Plaintiff made a series of loans to Defendant,

---

[4]  Plaintiff's Ex. 8.

[5]  Plaintiff's Ex. 13 at p. 2.

[6]  *Id.* at p. 1.

[7]  Plaintiff's Ex. 14 at pp. 2-3.

beginning on December 14, 2014 and concluding on February 8, 2016.

(e)     The previously mentioned loans totaled $19,324.71, which total is principal
and does not include interest.

(f)     Defendant agreed to repay the loans upon request or demand for payment
from Plaintiff.

(g)     Plaintiff demanded repayment of the loans from Defendant prior to
commencing the instant action in District Court.

(h)     Defendant refused to repay the loans to Plaintiff upon Plaintiff's demand
for payment.

(i)     Plaintiff and Defendant made a final oral contract on each occasion on
which Plaintiff loaned money to Defendant.

(j)     The terms of the contract required Defendant to repay each loan or all of the
loans together when Plaintiff requested repayment.

(k)     Defendant breached each oral contract by failing and refusing to repay the
loans upon demand for payment.

(l)     Plaintiff fully performed each oral contract.

(m)    Defendant's breach of the oral contracts for repayment has caused Plaintiff
damage in the liquidated amount of $19,324.71.

(n)     Plaintiff relied on Defendant's representation of his willingness and
intention to repay all or any of the loans upon request or demand from
Plaintiff.

(o)     Defendant did not provide any good or service to Plaintiff in consideration
of the loans other than his willingness and intention to repay the loans upon
request or demand for payment from Plaintiff.

(p)     Defendant has acknowledged he owes Plaintiff approximately $20,000 in at
least one phone conversation with Plaintiff.

35.    Based upon the record of such undisputed material facts, the Iowa District Court entered an order on January 9, 2018, granting the partial summary judgment in favor of the Plaintiff against the Defendant in the amount of $19,324.71, with interest at the legal rate of 3.7% from the date of the filing of the Plaintiff's petition, together with unspecified court costs.[8]

36.    The partial summary judgment reflects a recovery based solely upon the Plaintiff's contractual theories.  It does not contain any reference to the existence of fraud.

37.    The Iowa District Court noted that the Plaintiff's other theories of recovery remained scheduled for trial, but that "[i]f the Plaintiff decides not to proceed with the remaining claims in the Petition, a formal dismissal of those claims shall be filed well in advance of the trial date."[9]

38.    The Plaintiff elected to voluntarily dismiss the remaining claims in the Iowa Litigation on March 16, 2018, with an intent to collect the judgment rendered in her favor on her partial summary judgment motion.[10]

39.    No appeal was prosecuted following the dismissal of the remaining claims.[11]

---

[8]  Ex. 13 at 6.

[9]  *Id.*

[10]  The dismissal of the remaining claims rendered the partial summary judgment ruling a final judgment under Iowa law based upon the principles of pragmatic finality.  *Ahls v. Sherwood/Div. of Harsco Corp.*, 473 N.W.2d 619, 623 (Iowa 1991).

[11]  This Court is thus precluded from hearing any complaint regarding the propriety of the Final Judgment by the *Rooker-Feldman* doctrine, which prevents lower federal courts from reviewing a state court decision when the issues raised in the federal court would be "inextricably intertwined" with a state court judgment and the federal court would, in essence, be called upon to review the state court decision. *Davis v. Bayless*, 70 F.3d 367, 375-76 (5th Cir. 1995) (*citing United States v. Shepherd*, 23 F.3d 923, 924 (5th Cir. 1994)).  A claim entertained by a lower federal court is "inextricably intertwined" with those addressed in the state court "whenever the relief requested in the federal action would effectively reverse the state court decision or void its ruling."  *In re Popkin & Stern*, 259 B.R. 701, 706 (B.A.P. 8th Cir. 2001) (*quoting Bechtold v. City of Rosemount*, 104 F.3d 1062, 1065 (8th Cir. 1997)); *see also Weaver v. Texas Capital Bank N.A.*, 660 F.3d 900, 904 (5th Cir. 2011) [observing that "as we have noted in other cases, the *Rooker–Feldman* doctrine generally applies only where a plaintiff seeks relief that directly attacks the validity of an existing state court judgment"].  The doctrine recognizes that "judicial errors committed in state courts are for correction in the state court systems" through the appellate process.

40.     The factual issues as determined by the Iowa District Court in the Iowa Litigation, particularly with regard to the creation of the lending relationship between the Plaintiff and the Defendant were identical to those presented in this litigation.

41.     All of the issues as determined by the Iowa District Court were fully and fairly litigated in the Iowa Litigation.

42.     The factual issues as determined by the Iowa District Court in the Iowa Litigation were material and relevant to the disposition of claims in that action.

43.     The factual issues as determined by the Iowa District Court in the Iowa Litigation were necessary and essential to that court's judgment.

44.     The parties in this adversary case are identical to those in the Iowa Litigation.

*Bankruptcy Case Administration*

45.     About one month later, the Debtor-Defendant filed his voluntary petition for relief under Chapter 7 of the Bankruptcy Code with this Court on April 25, 2018.

46.     The Defendant's original Schedules and Statement of Financial Affairs were filed on May 22, 2018.[12]  The claim of the Plaintiff was scheduled as an "Unsecured Loan — Judgment" in the amount of $20,040.

47.     On May 25, 2018, the § 341 meeting of creditors was conducted in the Defendant's bankruptcy case by Mark A. Weisbart, the duly-appointed Chapter 7 Trustee.

48.     The Debtor-Defendant was examined under oath by the Trustee on a variety of topics, including whether there were any property "triggers" in his Iowa divorce decree which would entitle him to any award of property.[13]

49.     The Trustee eventually inquired about the general nature of the Iowa Litigation with the Plaintiff.

---

*Hale v. Harney*, 786 F.2d 688, 691 (5th Cir. 1986).

[12]  Plaintiff's Ex. 29 at 13.

[13]  Plaintiff's Ex. 53.

50.    In response to the Trustee's questions, the Debtor-Defendant emphatically denied that he had committed fraud and when asked by the Trustee whether the state court petition had contained an allegation of fraud, the Debtor-Defendant answered "no."

51.    At trial, the Defendant acknowledged that his response to the Trustee regarding the allegations in the Iowa Litigation was erroneous, but explained that he had not reviewed the year-old Iowa Litigation petition prior to the § 341 meeting and was simply attempting to refute any concerns held by the Trustee that he had *committed* fraud against the Plaintiff.

52.    The Trustee did not request any additional documentation from the Defendant with regard to the Iowa Litigation or any other concerns.

53.    The Trustee quickly filed his Report of No Distribution in the underlying Chapter 7 case on June 1, 2018, informing creditors that no assets were available in the Bohanna bankruptcy estate for distribution on creditor claims.[14]

54.    There is no credible evidence in the record to support any supposition that the Trustee was dissatisfied with the level of disclosure or cooperation from the Debtor-Defendant in this case

55.    There is no credible evidence in the record to support any supposition that the allegations arising from, or the eventual results of, the Iowa Litigation would have had any impact upon the administration of the bankruptcy estate for the benefit of creditors.

56.    On July 19, 2018, Plaintiff filed the present Complaint:  (1) objecting to the Debtor's discharge based upon an alleged false oath pursuant to 11 U.S.C. § 727(a)(4)(A) or, alternatively, (2) seeking to except the debt arising from the Iowa Judgment from any such discharge as a debt obtained by false pretenses, a false representation, or actual fraud under 11 U.S.C. § 523(a)(2)(A).

57.    On August 21, 2018, the Defendant filed his Answer to the Complaint, which contained a counterclaim for attorney's fees under § 523(d) to which the Plaintiff properly answered.[15]

---

[14]  See docket sheet entry of June 1, 2018 in case no. 18-40847.  Because it has no accompanying documentation, this Trustee Notice of No Distribution is not assigned a docket entry number.

[15]  Because the Defendant failed to raise or to introduce any evidence in support of his counterclaim under § 523(d), it is deemed abandoned at trial or, alternatively, is denied on the merits for his failure to present any evidence which would support the granting of relief under that statute.

58.   The Plaintiff demonstrated that the Defendant made a false statement under oath regarding the allegation of fraud asserted in the Iowa Litigation.

59.   Though the Defendant's denial at the § 341 meeting that fraud had been alleged in the Iowa Litigation was false, the Plaintiff has failed to demonstrate by a preponderance of the evidence that such false statement was material to the bankruptcy case and its administration.

60.   The Iowa Litigation had been concluded.

61.   The Iowa Litigation had been concluded with a knowing and intentional abandonment of the asserted fraud claim against the Defendant by the Plaintiff.

62.   Other than obtaining a general background regarding the Defendant's financial problems, the Trustee's inquiry fails to reveal any interest in pursuing any issue arising from the Iowa Litigation.

63.   Indeed, it would be highly unusual for any Chapter 7 case trustee to possess a motivation to pursue a determination regarding the dischargeability of any particular creditor's debt.

64.   Though the Defendant's response to the existence of a fraud allegation in the Iowa Litigation was undeniably false, an examination of the surrounding circumstances regarding the false oath fails to reveal the existence of a fraudulent intent.

65.   The Plaintiff has failed to demonstrate by a preponderance of the evidence that any false statement made by the Defendant regarding the existence of a fraud allegation in the then-completed Iowa Litigation was made by the Defendant with an actual fraudulent intent.

66.   The error committed by the Defendant in his denial of the existence of a fraud allegation in the Iowa Litigation does not warrant the invocation of the drastic penalty which would be inflicted by a denial of his Chapter 7 discharge.

67.   Both the Plaintiff and the Defendant are precluded by the principles of collateral estoppel from contesting the factual determination by the Iowa District Court that the series of loans from the Plaintiff to the Defendant was procured *"for the express and specific purpose of supporting Defendant and Defendant's wife and*

*children during their divorce proceedings.*"[16]

68.   While that particular linguistic construction presents some degree of ambiguity,[17] the circumstances as interpreted by the evidence in this case warrants a broader construction.[18]

69.   The actions of the Plaintiff toward the Defendant, particularly at the time in which the lending relationship began, are not consistent with the suspicions that she contends she had at that time.

70.   Indeed, any testimony that the Plaintiff rendered regarding her suspicions about any misbehavior by the Defendant at the inception of the Lending Period is not credible.

71.   The Plaintiff and the Defendant had a trusted relationship with each other at the inception of the Lending Period.

72.   The Plaintiff knew that the Defendant had separated from his family at the inception of the Lending Period.

73.   The Plaintiff had the ability to review the billing statements from her credit accounts on a monthly basis in the early stages of the Lending Period but elected not to scrutinize the Defendant's transactions until fifteen months later.

74.   Any purported intent by the Plaintiff to restrict the credit transactions to those which clearly benefit or protect only the family unit as a whole could have been accommodated by tendering the credit access to Mrs. Bohanna, but instead the Plaintiff tendered access to those accounts solely to the Defendant throughout the

---

[16]  Plaintiff's Ex. 13 at 2 (emphasis added).

[17]  While the use of the term "and" in this context can convey that the listed objects are to be considered together, it can just as easily convey that they can be considered individually.   Kenneth A. Adams & Alan S. Kaye, *Revisiting the Ambiguity of "And" and "Or" in Legal Drafting*, 80 St. John's L. Rev. 1167, 1172-74 (2006).  Thus, as Prof. Kirk notes, terms such as "charitable and educational institutions" or "hospital and burial expenses" "demonstrate *characteristics* which are, respectively, potentially cumulative and mutually exclusive."  Maurice B. Kirk*, Legal Drafting:  The Ambiguity of "And" and "Or"*, 2 Tex. Tech L. Rev. 235, 238 (1971) (internal quotations and italics omitted).

[18]  Additional support for a broader construction is provided by the general directive of the Bankruptcy Code to construe dischargeability issues liberally in favor of the debtor and strictly against parties seeking to except a particular debt from the scope of a debtor's discharge.

Lending Period.

75.  Thus, while it may be true that the Plaintiff was primarily motivated to provide the funds out of concern for the vulnerability of the Defendant's children, the scope of the agreement, as determined by the court in the Iowa Litigation, and as evidenced by the Plaintiff's own conduct in this case, was significantly broader.

76.  Notwithstanding the Plaintiff's arguments presented at the trial of this complaint, the scope of the agreement, as determined by the court in the Iowa Litigation, and as evidenced by the Plaintiff's actions and/or omissions, particularly at the time that the agreement was reached, authorized expenses incurred by the Defendant in his own individual capacity.

77.  The breadth of the authorization, as determined by the court in the Iowa Litigation is not easily violated by the incurrence of purchases by the Defendant for his own welfare.

78.  The breadth of the authorization, as evidenced by the Plaintiff's actions and/or omissions, is confirmed by the incurrence of purchases by the Defendant for his own welfare throughout the Lending Period without any scrutiny nor interference of any type by the Plaintiff.

79.  When she finally scrutinized the nature of the charges, it may be true that the Plaintiff was surprised to learn that the list of transactions within the Lending Period was not dominated by mortgage expenses or other household-related purchases; however, any such surprise is not the equivalent of fraud.

80.  More importantly, the determination of fraud in this context is not about the purchases that *were not* made, it is about the purchases that *were* made and whether such expenditures were within the scope of the agreement.

81.  The Court has painstakingly reviewed the billing statements and other limited financial information tendered into evidence.[19]

82.  Other than the listing of transactions within the monthly statements, the objective evidence tendered to the Court to explain the Defendant's spending history during the Lending Period or to test the legitimacy of the listed transactions was scarce and insufficient.

---

[19] *See generally* Ex. 15-18.

83.   Based upon the evidence tendered at trial, the Plaintiff's allegations regarding the Defendant's alleged fraud is basically supported only by surmise and suspicion.

84.   The Plaintiff may have suspected that some of the charges facilitated the Defendant's involvement with another woman, and such charges would have violated the scope of the agreement, but the Plaintiff has failed to tender credible evidence regarding the nature of the transactions to support any finding by this Court that the charges were in furtherance of any such relationship or for any other purpose that would violate the scope of the agreement as defined in the Iowa Litigation.

85.   The evidence clearly presents a plaintiff who is extremely disappointed by what she views as a betrayal by a trusted friend.  However, that is not the equivalent of fraudulent conduct.

86.   The Plaintiff has failed to demonstrate by a preponderance of the evidence that any debt owed to her by the Defendant was procured under circumstances constituting actual fraud.

87.   The Plaintiff has failed to demonstrate by a preponderance of the evidence that the Defendant made representations to the Plaintiff that the Defendant knew were false at the time such representations were made.

88.   The Plaintiff has failed to demonstrate by a preponderance of the evidence that the Defendant made false representations to the Plaintiff with the intention and purpose of deceiving the Plaintiff.

89.   The Plaintiff has failed to demonstrate by a preponderance of the evidence that she justifiably relied upon any false representations by the Defendant since no such false representations were made to the Plaintiff.

90.   While the circumstances demonstrate a significant financial loss to the Plaintiff, thereby placing the Plaintiff in a sympathetic light, such sympathy cannot be permitted to stand in lieu of the required degree of proper proof pertaining to the Defendant's conduct and intentions under these circumstances particularly in light of the Bankruptcy Code's directive that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor.

91.   To the extent any of these findings of fact constitute conclusions of law, the Court expressly adopts them as such.

## *CONCLUSIONS OF LAW*

1.  The Court has jurisdiction to consider the adversary complaint in this proceeding pursuant to 28 U.S.C. §§ 1334 and 157.

2.  This Court has authority to enter a final judgment in this adversary proceeding since it statutorily constitutes a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(A), (I), and (J) and meets all constitutional standards for the proper exercise of full judicial power by this Court.

3.  The Bankruptcy Code requires that a debtor be granted a discharge unless one of the statutory grounds for denial of that discharge is proven.  11 U.S.C. § 727(a).

4.  The denial of a debtor's discharge is considered an extreme remedy.  *Pher Partners v. Womble (In re Womble)*, 289 B.R. 836, 845 (Bankr. N.D. Tex. 2003) (*citing Rosen v. Bezner*, 996 F.2d 1527, 1531 (3d Cir. 1993)).

5.  "Courts should deny discharge only for very specific and serious infractions." *Martin Marietta Matl's Southwest, Inc. v. Lee (In re Lee)*, 309 B.R. 468, 476 (Bankr. W.D. Tex. 2004) (*citing Ichinose v. Homer Nat'l Bank (In re Ichinose)*, 946 F.2d 1169, 1172 (5th Cir. 1991)).

6.  A denial of discharge is to be imposed only upon those debtors who have not been honest and forthcoming about their affairs and therefore have not fulfilled the duties of full disclosure required of a bankruptcy debtor.  *Buckeye Retirement Properties v. Tauber (In re Tauber)*, 349 B.R. 540, 545 (Bankr. N.D. Ind. 2006) ["The denial of a debtor's discharge is akin to financial capital punishment. It is reserved for the most egregious misconduct by a debtor."].

7.  Thus, speculation and surmise about the existence of such misconduct are insufficient.  Probative evidence must be presented.

8.  To fulfill the statutory policy of providing a debtor with a "fresh start," the provisions of § 727(a) are construed strictly against parties seeking to deny the granting of a debtor's discharge and liberally in favor of a debtor.  *Laughlin v. Nouveau Body & Tan, L.L.C. (In re Laughlin)*, 602 F.3d 417, 421 (5th Cir. 2010); *Benchmark Bank v. Crumley (In re Crumley)*, 428 B.R. 349, 356 (Bankr. N.D. Tex. 2010).

9.  The same construction principles favoring a debtor are imposed in an action to

determine the dischargeability of a particular debt. *FNFS, Ltd. v. Harwood (In re Harwood)*, 637 F.3d 615, 619 (5th Cir. 2011) (*citing Hudson v. Raggio & Raggio, Inc. (In re Hudson)),* 107 F.3d 355, 356 (5th Cir. 1997)).

10.   The Plaintiff bears the burden of proving that the Debtor is not entitled to a discharge under § 727.  The standard of proof for its claim is a preponderance of the evidence. *Cadle Co. v. Duncan (In re Duncan),* 562 F.3d 688, 695 (5th Cir. 2009); *Beaubouef v. Beaubouef (In re Beaubouef),* 966 F.2d 174, 178 (5th Cir. 1992).

11.   A preponderance of the evidence standard also applies to the determination of the dischargeability of a particular debt. *Grogan v. Garner*, 498 U.S. 279, 287-88 (1991).

*Standards for Issue Preclusion (Collateral Estoppel).*

12.   "Collateral estoppel or, in modern usage, issue preclusion, 'means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.'"[20]

13.   In other words, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation."[21]

14.   "To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions."[22]

15.   In the bankruptcy dischargeability context, "parties may invoke collateral estoppel in certain circumstances to bar relitigation of issues relevant to dischargeability" and thereby satisfy the elements thereof.[23]

---

[20]   *Schiro v. Farley*, 510 U.S. 222, 232 (1994) (internal quotations omitted).

[21]   *Montana v. U. S*., 440 U.S. 147, 153 (1979) (*citing Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 5 (1979)).

[22]   *Id.* at 153-54.

[23]   *Raspanti v. Keaty (In re Keaty)*, 397 F.3d 264, 270 (5th Cir. 2005) (quotation marks omitted).

16.   Namely, when an issue that forms the basis for a creditor's theory of nondischargeability has been litigated in a prior proceeding, neither the creditor nor the debtor may relitigate those grounds.[24]

17.   While the doctrine of issue preclusion applies in bankruptcy dischargeability litigation, a bankruptcy court retains exclusive jurisdiction to determine whether a debt is dischargeable.[25]

18.   The inquiry into the preclusive effect of a state court judgment is guided by the Full Faith and Credit Act, which states that "judicial proceedings . . . shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken."[26]

19.   "It has long been established that § 1738 does not allow federal courts to employ their own rules of res judicata in determining the effect of state judgments. Rather, it goes beyond the common law and *commands* a federal court to accept the rules chosen by the State from which the judgment is taken."[27]

20.   Effectively, the "Full Faith and Credit Act expands the Full Faith and Credit Clause and requires federal courts to give full faith and credit to state court proceedings."[28]

21.   Thus, federal courts are not free to ignore the principles of issue preclusion utilized by the forum state in which the prior judgment was entered.[29]

---

[24]   *RecoverEdge, L.P. v. Pentecost*, 44 F.3d 1284, 1294 (5th Cir. 1995).

[25]   *Grogan,* 498 U.S. at 284 n. 11.

[26]   28 U.S.C.A. § 1738 (West 2006).  In the vernacular of the Supreme Court, § 1738 "implements" the Full Faith and Credit Clause of the United States Constitution – U.S. Const., Art. IV, § 1.  *Migra v. Warren City School Dist. Bd. of Ed.*, 465 U.S. 75, 80, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984).

[27]   *Shimon v. Sewerage & Water Bd. Of New Orleans*, 565 F.3d 195, 199 (5th Cir. 2009) (emphasis added) (*citing Parsons Steel, Inc. v. First Ala. Bank*, 474 U.S. 518, 523, 106 S.Ct. 768, 88 L.Ed.2d 877 (1986)) and *Kremer v. Chem. Constr. Corp*., 456 U.S. 461, 481–82, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982)).

[28]   *Davis v. Chase Home Finance, LLC*, 597 F. App'x 249, 252 (5th Cir. 2015).

[29]   *Schwager v. Fallas (In re Schwager)*, 121 F.3d 177, 181 (5th Cir. 1997).

22.   Because the Iowa Judgment arising from the Iowa Litigation involving these parties was entered in an Iowa state court, this Court is required to apply the Iowa law of issue preclusion.[30]

23.   In general, collateral estoppel prevents parties to a prior action in which judgment has been entered from relitigating in a subsequent action issues raised and resolved in the previous action.[31]

24.   Specifically a party is collaterally estopped from raising an issue under Iowa law when the following prerequisites are established:
      (1) the issue concluded must be identical;
      (2) the issue must have been raised and litigated in the prior action;
      (3) the issue must have been material and relevant to the disposition of the prior action; and
      (4) the determination made of the issue in the prior action must have been necessary and essential to the resulting judgment.[32]

25.   The Iowa Supreme Court has held that the entry of a summary judgment satisfies the "actually litigated" requirement for the application of issue preclusion under Iowa law.[33]

---

[30] *Ingalls v. Erlewine (In re Erlewine)*, 349 F.3d 205, 210 (5th Cir. 2003); *Gober v. Terra + Corp. (In re Gober)*, 100 F.3d 1195 (5th Cir. 1996).

[31] *Hunter v. City of Des Moines,* 300 N.W.2d 121, 123 (Iowa 1981).

[32] *Stender v. Blessum*, 897 N.W.2d 491, 513 (Iowa 2017) (quoting *Hunter*, 300 N.W.2d at 123); *Comes v. Microsoft Corp.*, 709 N.W.2d 114, 118 (Iowa 2006); *See also Winnebago Indus., Inc. v. Haverly*, 727 N.W.2d 567, 571 (Iowa 2006) (citations omitted) [noting that under issue preclusion, "once a court has decided an issue of fact or law necessary to its judgment, the same issue cannot be relitigated in later proceedings."].

[33] *Hall v. Barrett*, 412 N.W.2d 648, 651 (Iowa 1987).  *See also Ideal Mut. Ins. Co. v. Winker*, 319 N.W.2d 289, 296 (Iowa 1982).  The Iowa Supreme Court observed in *Winker* that:

Judgment entered after trial, however, is not the only type of determination which will satisfy the purpose of the actual litigation requirement.  That purpose can also be satisfied by a determination made without the full exploration that an issue receives during [an actual] trial on the merits—by motion for summary judgment, a motion to dismiss, or their equivalents.

*Id.* at 296 (citing RESTATEMENT (SECOND) OF JUDGMENTS § 68 cmt. d (1980)).

26.     The decision was rendered on the merits by the Polk County Iowa District Court
        and is now a final judgment.  There is no pending appeal of the Iowa Judgment.

27.     Among the issues determined in the Iowa Litigation which both the Plaintiff and
        the Defendant are now precluded from relitigating in this action is that the loan
        transaction between the parties was "for the express and specific purpose of
        supporting Defendant and Defendant's wife and children during their divorce
        proceedings."[34]

*§ 727(a)(4)(A): False Oaths.*

28.     Section 727(a)(4)(A) provides:

        The court shall grant the debtor a discharge unless —

        (4) the debtor knowingly and fraudulently, in or in connection with the case—
              (A) made a false oath or account . . . .

29.     "The purpose of § 727(a)(4)(A) is to enforce a debtor's duty of disclosure and to
        ensure that the Debtor provides reliable information to those who have an interest
        in the administration of the estate.  Thus, complete financial disclosure is a
        condition precedent to the privilege of discharge."  *Fiala v. Lindemann (In re
        Lindemann)*, 375 B.R. 450, 469 (Bankr. N.D. Ill. 2007) (citations and quotations
        omitted).

30.     "False oaths sufficient to justify the denial of discharge include: (1) a false
        statement or omission in the debtor's schedules; or (2) a false statement by the
        debtor at the examination during the course of the proceedings."  *Beaubouef*, 966
        F.2d at 178.

31.     When evaluating whether a false statement is made knowingly, one court has
        explained:

              A statement is considered to have been made with knowledge
              of its falsity if it was known by the debtor to be false, made
              without belief in its truth, or made with reckless disregard for
              the truth. . . . Courts may consider the debtor's education,
              business experience, and reliance on counsel when evaluating
              the debtor's knowledge of a false statement, but the debtor is

---

[34]  Plaintiff's Ex. 13 at 2.

> not exonerated by pleading that he or she relied on patently
> improper advice of counsel.  Furthermore, a debtor cannot,
> merely by playing ostrich and burying his head deeply enough
> in the sand, disclaim all responsibility for statements which he
> has made under oath.

*Wachovia Bank, N.A. v. Spitko (In re Spitko)*, 357 B.R. 272, 313-14 (Bankr. E.D. Pa. 2006).

32.     Indeed, even multiple errors do not mandate the finding of a false oath without sufficient evidence of a fraudulent intent.  *First United Bank & Trust Co. v. Buescher (In re Buescher)*, 491 B.R. 419, 432 (Bankr. E.D. Tex. 2013), *aff'd*, 783 F.3d 302 (5th Cir. 2015).

33.     As the objecting party, the Plaintiff carries the burden of proof under § 727(a)(4)(A) and must demonstrate by a preponderance of evidence that:
        (1) the debtor made a statement under oath;
        (2) the statement was false;
        (3) the debtor knew the statement was false;
        (4) the debtor made the statement with fraudulent intent; and
        (5) the statement materially related to the bankruptcy case.

*Judgment Factors, LLC v. Packer ( In re Packer)*, 816 F.3d 87, 94 (5th Cir. 2016); *Cadle Co. v. Duncan (In re Duncan)*, 541 F.3d 688, 695 (5th Cir. 2009).

34.     If a plaintiff establishes a *prima facie* case that a debtor made a materially false statement, then the burden shifts to the debtor to present evidence that he or she is innocent of the charged offense.  *Id*. at 696.

35.     A plaintiff in a § 727(a)(4)(A) action must demonstrate by a preponderance of the evidence an actual intent to hinder, delay, or defraud creditors — a constructive intent is insufficient.  *Harwood*, 404 B.R. at 384 (citing *Chastant*, 873 F.2d at 91).

36.     In most circumstances only the debtor can testify directly concerning his or her intent and "rare will be the debtor who willingly provides direct evidence of a fraudulent intent."  *Neary v. Darby (In re Darby)*, 376 B.R. 534, 541 (Bankr. E.D. Tex. 2007).  Instead, the existence of a fraudulent intent is most often betrayed by an examination of a course of conduct.  *Id.*; *see also First Tex. Savings Assoc. v. Reed (In re Reed)*, 700 F.2d 986, 991 (5th Cir. 1989).

37.     Thus, "[f]raudulent intent may be proved by showing either actual intent to deceive or a reckless indifference for the truth." *Neary v. Hughes (In re Hughes)*, 353 B.R. 486, 504 (Bankr. N.D. Tex. 2006); *see also*, *Sholdra v. Chilmark Fin., LLP (In re Sholdra)*, 249 F.3d 380, 382-83 (5th Cir. 2001).

38.     A false statement or omission is material if it "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Andra Group, L.P. v. Gamble-Ledbetter (In re Gamble-Ledbetter)*, 419 B.R. 682, 692 (Bankr. E.D. Tex. 2009) (*citing Duncan*, 562 F.3d at 695).[35]

39.     Because the Plaintiff has failed to sustain her burden of proof to show by a preponderance of the evidence that the false statement made under oath by the Debtor-Defendant in this case regarding the allegations in the Iowa Litigation was made with a fraudulent intent, or was material to the administration of the estate, the relief sought by the Plaintiff under § 727(a)(4)(A) must be denied.

40.     Accordingly, the Court will issue an order of discharge for the Debtor-Defendant.

*Nondischargeability Under § 523(a)(2)(A):  Debt Arising from False Pretenses, False Representation or Actual Fraud.*

41.     The Plaintiff's Complaint further seeks a determination that the debt owed to her should be excepted from discharge under § 523(a)(2)(A) as a debt obtained by false pretenses, a false representation, or actual fraud.

42.     11 U.S.C. § 523(a)(2)(A) of the Bankruptcy Code provides that:

> a discharge under §727 of this title does not discharge an individual debtor from any debt for money, property, or services, ... to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

---

[35] However, a finding of materiality is admittedly not dependent solely upon the value of the omitted assets or whether the omission was detrimental to creditors. *Pratt*, 411 F.3d at 566.

43.     Section 523(a)(2)(A) encompasses similar but distinct causes of action.  Though other circuits have applied a uniform standard to all § 523(a)(2)(A) actions,[36] the Fifth Circuit has distinguished the elements of "actual fraud" and of "false pretenses and false representations."  *Pentecost*, 44 F.3d at 1291.

44.     The distinction recognized by the Fifth Circuit appears to be a chronological one, resting upon whether a debtor's representation is made with reference to a future event, as opposed to a representation regarding a past or existing fact. *Bercier*, 934 F.2d at 692 [A debtor's promise ... related to a future action which does not purport to depict current or past fact ... therefore cannot be defined as a false representation or a false pretense].[37]

45.     Because any representation by the Defendant regarding his future use of any funds which the Plaintiff might choose to supply, or any of Plaintiff's expectations arising therefrom, pertained to a future event, any such statement cannot be properly characterized as a false representation or a false pretense in this Circuit.

46.     Thus, the validity of the Plaintiff's claim under § 523(a)(2)(A) in this case rests upon sufficient proof that the debt was obtained by actual fraud.

---

[36]  *See, e.g., Britton v. Price (In re Britton)*, 950 F.2d 602, 604 (9th Cir. 1991); *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287 (8th Cir. 1987).  Though some bankruptcy courts outside of the Fifth Circuit have cited the decision of the United States Supreme Court in *Field v. Mans*, 516 U.S. 59 (1995), in support of their proposition that all of the § 523(a)(2)(A) actions are governed by the elements for actual fraud, *see, e.g., AT&T Universal Card Services v. Ellingsworth (In re Ellingsworth)*, 212 B.R. 326 (Bankr. W.D. Mo. 1997); *AT& T Universal Card Services v. Alvi (In re Alvi)*, 191 B.R. 724 (Bankr. N.D. Ill. 1996); the Supreme Court in that case was actually distinguishing the language used in § 523(a)(2)(A) from that utilized in § 523(a)(2)(B) in order to determine the degree of reliance necessary above mere reliance in fact in order to exempt a debt from discharge under (a)(2)(A).  Since the Supreme Court specifically refused to even apply their direct holding regarding the degree of  reliance in actual fraud cases to cases of false pretense or false representation, 116 S.Ct. at 443, n. 8, the statement that the Court erased all distinctions between the three (a)(2)(A) actions strains credibility.

[37]  While "false pretenses" and "false representation" both involve intentional conduct intended to create and foster a false impression, the distinction is that a false representation involves an express statement, while a claim of false pretenses may be premised on misleading conduct without an explicit statement.  *See Walker v. Davis (In re Davis)*, 377 B.R. 827, 834 (Bankr. E.D. Tex. 2007); and *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 760 (Bankr. E.D. Tenn. 2003).  In order for a debtor's representation to constitute a false pretense or false representation, it "must have been: (1) [a] knowing and fraudulent falsehood, (2) describing past or current facts, (3) that [was] relied upon by the other party."  *Allison*, 960 F.2d at 483; *see Bercier*, 934 F.2d at 692 ["to be a false representation or false pretense under § 523(a)(2), the false representations and false pretenses must encompass statements that falsely purport to depict current or past facts"].

47.　To have a debt excepted from discharge pursuant to the "actual fraud" provision in § 523(a)(2)(A), an objecting creditor must prove that:

　　　(1) the debtor made representations;
　　　(2) at the time they were made the debtor knew they were false;
　　　(3) the debtor made the representations with the intention and purpose to deceive the creditor;
　　　(4) the creditor justifiably relied on such representation; and
　　　(5) the creditor sustained losses as a proximate result of the representations.

*Pentecost*, 44 F.3d at 1293, *as modified by the United States Supreme Court decision of Field v. Mans*, 516 U.S. 59 (1995) [regarding the proper standard of reliance].

48.　Because the Court concludes that the Plaintiff has failed to prove by a preponderance of the evidence that any amount encompassed by the Iowa Judgment was obtained by actual fraud, judgment must be rendered for the Debtor-Defendant under § 523(a)(2)(A).

49.　Because the Court concludes that the Defendant has failed to present any evidence upon his asserted counterclaim, judgment must be rendered for the Plaintiff and Counter-Defendant upon the Defendant's counterclaim.


## CONCLUSION

50.　Based upon the Court's conclusions that the Plaintiff, Alyson Simmons, has failed to prove by a preponderance of the evidence the existence of all of the requisite elements under either 11 U.S.C. § 727(a)(4)(A) or 11 U.S.C. § 523(a)(2)(A), all relief sought by the Plaintiff's Complaint must be denied and judgment on the complaint must be rendered for the Debtor-Defendant, Darryle D. Bohanna, Jr., in this action.

51.　The Court further concludes that the Debtor-Defendant, Darryle D. Bohanna, Jr., is entitled to the entry of a discharge order pursuant to 11 U.S.C. § 727(a).

52.　All relief requested in the Defendant's counterclaim must be denied and judgment on the counterclaim shall be rendered for the Plaintiff and Counter-Defendant, Alyson Simmons.

53.　To the extent any of these conclusions of law constitute findings of fact, the Court

expressly adopts them as such.

54.    An appropriate judgment shall be entered consistent with these findings and conclusions.

Signed on 11/15/2019

THE HONORABLE BILL PARKER
CHIEF UNITED STATES BANKRUPTCY JUDGE